**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL AIRPORT CENTERS L.L.C., and IACEA LLC,** | ) ) ) | |
| **Plaintiffs,** | ) ) | No. 03 C 8104 |
| v. | ) ) | Judge Wayne R. Andersen |
| **JACOB CITRIN,** | ) ) ) | |
| **Defendant.** | ) | |

**THIRD AMENDED COMPLAINT**

Plaintiffs, International Airport Centers L.L.C. and IACEA LLC, by and through their undersigned attorneys, for their Third Amended Complaint against Defendant, Jacob Citrin ("Citrin"), allege as follows:

**THE PARTIES**

1.  Plaintiff International Airport Centers L.L.C. ("IAC" or "Company") is a Delaware limited liability company that was formed in 1995. IAC is engaged in the business of acquiring, owning, holding for investment developing and operating structures designed primarily to meet the warehouse, distribution and office needs of air freight companies and related users located in the environs of international airports. IAC's principal offices are located at 1849 Green Bay Road, 4th Floor, Highland Park, Illinois, 60035.

2.  Plaintiff IACEA is a Delaware limited liability company also with its principal offices at 1849 Green Bay Road, 4th Floor, Highland Park, Illinois, 60035. IACEA is a former member of IAC and was the equivalent of a corporate holding company. IACEA's assets have been subsumed into IAC. IACEA therefore is a nominal party. As a benefit of his employment with IAC, Defendant Citrin was granted a Grant of Subordinated Non-Voting Member Interest

(the "Grant") (attached hereto as Exhibit 1) which awarded him an interest in IACEA subject to the terms therein.

3.   Defendant Citrin resides at 10 West Street, Apartment 29E, New York, New York, 10004. Until October 30, 2003, Citrin was a senior officer and employee of IAC, serving as a "Managing Director." Through a holding in another related entity, Citrin holds a derivative, indirect interest of less than 1% in IAC.  Citrin is the founding partner and chairman of Cargo Ventures, LLC, a New York limited liability company in direct competition with IAC.

## JURISDICTION AND VENUE

4.   Subject matter jurisdiction is alleged on the basis of violations of 18 U.S.C. § 1030 *et seq*., the Computer Fraud and Abuse Act ("CFAA"). The Court also holds jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims brought under the CFAA that they form a part of the same case or controversy.

5.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to this action occurred in this District.

### Defendant's Scheme to Misappropriate a Corporate Opportunity

6.   Sometime at a date unknown to Plaintiffs, but before October, 2003, Citrin decided that he would leave his IAC employment and compete with IAC. He did not disclose his decision to IAC, but instead, made secret plans to compete with IAC in clear breach of his fiduciary obligations as a Managing Director of the Company.

7.   Citrin's principle function at IAC was to find real estate that could be developed into distribution facilities for airport related usage.  In that capacity, Citrin identified a property known as the Eagle Facility in Boston, Massachusetts to IAC in early 2003. Thereafter, IAC entered into an agreement to purchase the Eagle Facility and began due diligence work as part of

that transaction. However, in March 2003, Citrin directed IAC's general counsel to issue a letter terminating IAC's contract to purchase the Eagle Facility.  Despite that decision, IAC continued to have an interest in acquiring the Eagle Distribution Facility based upon Citrin's advice and representations that he was seeking solutions to the problems he had reported. Citrin presented the Eagle Facility transaction to IAC again in September, 2003, knowing that IAC was in the process of negotiating a significant asset sale and joint venture with AMB Properties ("AMB"). IAC's management committee determined that IAC would offer the Eagle Facility transaction to AMB as a sign of their good faith and would consider purchasing the Eagle Facility again after the joint venture with AMB was completed if AMB elected not to purchase the Eagle Facility itself. Ultimately, AMB decided that it was too preoccupied with other business to purchase the Eagle Facility at that time. The Eagle Facility remained a potential target for the Company's future acquisition.

8.    Meanwhile, on information and belief, Citrin was communicating with his father-in-law, Christopher Jeffries, concerning Jeffries' interest in entering the air cargo and logistics real estate market – the same industry in which IAC operated.  Jeffries is the founder of Millennium Partners – a successful real estate development firm.  On information and belief, sometime in or around mid to late 2003, Citrin disclosed IAC's confidential information concerning the Eagle Facility to Millennium Partners, through Jeffries, without advising or seeking permission from IAC.

9.    On information and belief, in August and September 2003, while still employed as a senior executive by IAC, Citrin wrongfully diverted IAC's resources in furtherance of his secretive plan to purchase  the Eagle Facility with his father-in-law. In or around August 2003, Citrin requested under false pretenses that IAC's general counsel provide him with IAC's

transactional documents concerning its previously withdrawn contract for the purchase of the Eagle Facility. IAC's general counsel provided those documents to Citrin shortly thereafter, being misled by Citrin to believe that the information was being requested to advance IAC's business interests. In fact, Citrin sought the information as part of his scheme to acquire the Eagle Facility for his own benefit. In September 2003, Citrin instructed an unsuspecting co-worker to release the environmental due diligence materials that IAC had paid for and prepared for the Eagle Facility, so that those materials could be wrongfully used for Citrin's purchase of the Eagle Facility. Based on Citrin's instruction, the co-worker authorized the release of environmental reports created for IAC regarding the Eagle Facility. Citrin falsely advised the co-worker that IAC would be reimbursed for releasing its due diligence. IAC was never reimbursed. Citrin did not disclose to anyone at IAC that he was planning to acquire the Eagle Facility because he knew he was acting wrongfully. IAC would not have released its transaction materials for Citrin's benefit had it known that Citrin was using the information to facilitate his own purchase of the Eagle Facility.

10. On September 26, 2003, while still employed by IAC, Citrin secretly formed a web of related entities to invest in and to acquire the Eagle Facility. On information and belief, Citrin formed a company called Horizon/McClellan L.L.C., a Massachusetts limited liability company, which holds or held the title to the Eagle Facility. Horizon/McClellan is managed by a company called Cargo Ventures L.L.C. Citrin owns Cargo Ventures, a Massachusetts limited liability company, which he established as an investment vehicle for holding an interest in Horizon/McClellan. Thus, through Cargo Ventures, Citrin holds a 50% interest in Horizon/McClellan, which he holds as nominee for Jeffries and Millennium Properties. The other 50% interest in Horizon/McClellan is held by an entity called Southwest Industrial

Development, Ltd. – a Texas limited partnership. On information and belief, Millennium Partners, through or at the direction of Jeffries, financed Citrin's purchase of the Eagle Facility.

11. On information and belief, using IAC's confidential due diligence materials and confidential transaction documents concerning the Eagle Facility, Citrin secretly engaged in negotiations for the sale of the Eagle Facility to Horizon. Citrin and his group closed on the Eagle Facility on September 30, 2003. Thus, while still serving as an IAC Managing Director, Citrin wrongfully and secretly appropriated a 50% interest in the Eagle Facility, thereby usurping IAC's valuable corporate opportunity to acquire that property with the use of IAC's resources. Citrin never requested, and IAC never granted, authorization for him to engage in his own negotiations to purchase the Eagle Facility for himself, Millennium Properties, or any entities within their ownership, control or partnership. Similarly, Citrin never requested, nor did IAC ever grant him, the use of IAC's due diligence materials and transactional documents for his purchase of the Eagle Facility.

12. Additionally, as the chairman of Cargo Ventures, a company which directly competes with IAC, it is inevitable that Citrin disclosed and will continue to disclose IAC's trade secrets to Cargo Ventures. While an employee of IAC, Citrin had access to and possessed extensive and intimate knowledge of IAC's most sensitive trade secrets, including, but not limited to: IAC's financial modeling, market research, the expiration schedules of IAC's tenant leases, various methods of meeting tenant needs, and IAC's tenant contact information and tenant relationships. These trade secrets, both individually and in the aggregate, gave Citrin an advantage over other potential competitors that is both unique and unfair. And, since he performs functions for Cargo Ventures that are identical to those he performed for IAC, it is impossible that Citrin has refrained from using the knowledge of these trade secrets in the course

of his work for Cargo Ventures. Indeed, since his termination from IAC, Citrin has actively used his knowledge of IAC's trade secrets for the benefit of Cargo Ventures. In May 2004, Citrin secured the purchase of a distribution facility in Los Angeles commonly known as the Exchange – a property which IAC also sought to develop. After purchasing the property, Citrin lured one of IAC's then tenants out of an IAC facility and into the Exchange as a result of his knowledge of IAC's research concerning the Los Angeles market, the expiration date and other terms of the tenant's lease, and IAC's relationship with the tenant.

13. Citrin never disclosed the formation of Cargo Ventures or the purchase of the Eagle Facility to IAC in September 2003 because he knew it was wrongful. Citrin had previously expressed an interest in personally acquiring property with family members that IAC had elected not to purchase but was still considering. IAC was told Citrin that it was inappropriate for him to acquire the property for himself and he was not permitted to do so. With the Eagle Facility, Citrin knew that it was improper for him to purchase the property with his family members so he wrongfully concealed his plans from IAC and deceived the Company

14. Citrin maintained his position at IAC for a month following his secretive purchase of the Eagle Facility, all the while neglecting his duties at the Company and conducting business for Cargo Ventures. In late October 2003, knowing that his days at IAC were numbered because of complaints by co-workers and management, Citrin contacted an IAC broker (who leased space at an IAC facility near JFK Airport in New York) and sought to countermand instructions that the broker had received from IAC concerning contacting existing tenants regarding lease negotiations. Citrin represented to the broker on the eve of his departure that he was a Managing Director of IAC with full authority. Citrin even attended and participated in an

IAC Board of Managers meeting on October 28, 2003. Citrin portrayed himself as nothing less than a senior officer of IAC during the entire period that he was dealing for himself.

15.     In July, 2003, Norman Perlmutter ("Perlmutter"), the Chairman of IAC's Board of Managers, began to receive reports from IAC employees regarding Citrin's abusive and insubordinate behavior.  Two of Citrin's coworkers complained that his demeanor was condescending and his instructions to employees were vague.  Also, without IAC's knowledge or authority, Citrin granted a $171,000 lease concession to a tenant and, thus, exposed IAC to a substantial potential landlord obligation.  Then, in October, 2003, Citrin failed to attend no less than five important, mandatory IAC management meetings.  Perlmutter made several attempts to ask Citrin why he had failed to attend these meetings; however Citrin was evasive or unresponsive.  Finally, on October 22, 2003, Perlmutter sent Citrin a letter detailing his failures and warning him that, if he failed to satisfactorily respond by October 27, 2003, he would be fired for cause.  Citrin failed to satisfactorily respond.  Indeed his only response came in the form of the letter of resignation he delivered on October 30, 2003.  IAC informed Citrin in a letter dated October 30, 2003 that he was terminated for cause (attached hereto as Exhibit 2).

### The Grant

16.     When Citrin became a member of IACEA on December 4, 2000, he executed the Grant. (Exhibit 1).  The Grant accorded Citrin an indirect interest in IAC in consideration for Citrin's agreement to a covenant not to compete contained therein.  (Exhibit 1 § 5(a)).  That covenant provides that, for a period of two years following the termination of his employment with IAC, Citrin:

> will not be engaged as employee of any company if 5% or more of their business is, or will be, to acquire, own, hold for investment, develop or operate structures designed primarily to meet the warehouse and distribution needs of air freight companies and

7

>   related users located in the environs of an international airport
>   ("Distribution facilities") which international airport is either one
>   in which IAC has or is developing Distribution Facilities or is one
>   in which IAC has in the past five years has in its Annual Business
>   Plan an initiative to own, operate or develop Distribution Facilities.

(Exhibit 1 § 5(a)). The Grant further provides that this restrictive covenant shall be void in the event of a Change of Control at IAC or the termination of Citrin's employment not for cause. IAC continues to own, develop, lease, purchase, sell and seek real estate in or near international airports and there has been no Change of Control at IAC since the Grant became effective.

17. During the two years following his termination for cause, and continuing through the present, Citrin has actively competed against IAC in markets across the country, including Boston, Los Angeles, Seattle, New Jersey and New York, in direct violation of the Grant.

18. Subsequent to Citrin's termination for cause, on November 20, 2003, IACEA exercised its rights under Section 2 of the Grant to purchase Citrin's unvested interest under the Grant and, in accordance with its terms, tendered to him a check for one dollar ($1.00) (*see* Exhibit 1 § 2). In violation of the terms of the Grant, Citrin rejected the tender.

### Citrin's Destruction of IAC's Records

19. IAC's October 30, 2003 letter to Citrin contained a demand that Citrin return all company property – "tangible and intangible…including, without limitation, computers, laptop or otherwise, servers, snap or otherwise, and any and all documents and other Company information that you may have removed from any of the foregoing…as well as any copies" – in his possession. (Exhibit 2, p. 2). Despite that demand, Citrin attempted to conceal the depth of his deception and disloyalty to IAC by destroying company records. During his tenure with IAC, the Company provided Citrin with a laptop computer and a snap server (a portable, network

accessible hard-drive) for his use as a Managing Director. Citrin used the computer and snap server in the course of his employment. After using IAC's confidential information to misappropriate the Eagle Facility, Citrin attempted to wipe evidence of that misconduct from the computer and snap server. Specifically, Citrin installed *three* computer programs ("Privacy Expert", "Destroy It", and "Window Washer") onto the computer; these programs were specifically designed by their manufacturers to enable users to completely and irretrievably delete information from a computer. Citrin used one or more of these programs to permanently delete a large amount of data from IAC's laptop, including IAC's data pertaining to the Eagle Facility, as well as the documents he used in his own purchase of the Eagle Facility. IAC will never know how much and what information Citrin deleted, because he also deleted all of the data contained on the snap server — the device used to back-up the laptop that would have shown which data was deleted. Thus, Citrin rendered the laptop useless because IAC can never know whether the data that Citrin did not delete was compromised in any way. Since Citrin selectively deleted and manipulated some data, while only partially deleting other data, IAC can have no assurance as to the integrity of the data that it was able to recover from the laptop.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**

20.     Plaintiffs, as and for paragraph 20 of Count I, re-allege paragraphs 1 – 19 as though fully set forth herein.

21.     Citrin owed Plaintiffs a fiduciary duty of honesty and undivided loyalty.

22.     Citrin breached his fiduciary duty to Plaintiffs in at least the following ways, causing Plaintiffs substantial injury:

   a)     diverting and misusing Company resources under false pretenses for his own gain;

9

      b)    secretly misappropriating IAC's corporate opportunity in the Eagle Facility, knowing it was in violation of his duties and the Plaintiffs' policies and practices;

      c)    concealing his wrongful purchase of the Eagle Facility from Plaintiffs; and

      d)    permanently deleting IAC's computer records using special destruction software so there is little or no trace of what was destroyed, in anticipation of competing with Plaintiffs and to conceal his misconduct.

WHEREFORE, for all the foregoing reasons, Plaintiffs, International Airport Centers L.L.C. and IACEA LLC, respectfully request that this Court grant the following relief:

A. An order for an accounting to specifically identify all revenue realized by Citrin, either directly or through Cargo Ventures, from, in connection with or as a result of the purchase of the Eagle Facility;

B. Imposition of a constructive trust on all assets presently being held by Citrin, either directly or through Cargo Ventures, so that it may be determined whether assets of Plaintiffs are being held in furtherance of or as a consequence of the usurpation of the Eagle Facility corporate opportunity;

C. An order for an accounting requiring Citrin to account for the Eagle Facility, including all funds collected therefrom, whether as a result of those properties' development, lease, distribution, or otherwise;

D. An order requiring the return of all assets presently held or previously utilized by Citrin, either directly or through Cargo Ventures, in furtherance or development of, or realized from or in connection with or as a result of the usurpation of IAC's corporate opportunity in the Eagle Facility;

E. An order restraining Citrin, either directly or through Cargo Ventures, and any individual or entity acting in concert with him, from using or benefiting from Plaintiffs' assets;

F. An order requiring Citrin to disgorge and forfeit all compensation or other interests and benefits received from Plaintiffs from the time when he breached his fiduciary duties owed to them;

G. That a judgment be entered in favor of Plaintiffs and against Citrin for compensatory damages in an amount presently unknown to Plaintiffs but in good faith and reasonably believed to be in excess of $100,000;

H.      That a judgment be entered in favor of Plaintiffs and against Citrin for punitive damages in an amount sufficient to generally and specifically deter his misconduct in the future;

I.      An order awarding Plaintiffs its costs incurred in this action, including its attorneys' fees; and

J.      An order awarding Plaintiffs such other and further relief as is just and equitable.

## COUNT II
## Breach of Contract

23.     Plaintiffs, as and for paragraph 23 of Count II, re-allege paragraphs 1 – 19 as though fully set forth herein.

24.     In December 2002, IACEA and Citrin entered into the Grant. (Exhibit 1).

25.     The Grant accorded Citrin an indirect interest in IAC in consideration for a covenant not to compete contained therein.

26.     Plaintiffs fully performed their duties under the Grant.

27.     Upon the breach of his fiduciary duty to IAC, Citrin was both in law and in fact terminated for cause. Accordingly, Citrin has forfeited all future rights enumerated in the Grant.

28.     IACEA, thus, was within its right to repurchase the unvested portion of Citrin's rights under the Grant for the sum of $1.00. (Exhibit 1 § 2).

29.     As a result of his wrongful acquisition of the Eagle Facility, as well as other of his business ventures, Citrin is and has been in direct competition with IAC since he was terminated for cause. Citrin has thus breached the covenant not to compete contained in the Grant, causing Plaintiffs substantial damages. (Exhibit 1 § 5(a)).

WHEREFORE, for all the foregoing reasons, Plaintiffs, International Airport Centers L.L.C. and IACEA LLC, respectfully request that the Court grant the following relief:

A.      An order declaring and adjudging that Citrin has breached the covenant not to compete contained in the Grant;

B. An order declaring and adjudging that under the Grant of Subordinated Non-Voting Member Interest, IACEA properly exercised its right to repurchase the unvested portion of Citrin's rights under the Grant for $1.00;

C. An order for an accounting requiring Citrin to account for the Eagle Facility, as well as any and all other transactions made in violation of the covenant not to compete contained in the Grant during the period set forth therein, including all funds collected therefrom, whether as a result of those properties' development, lease, distribution, or otherwise;

D. An order requiring Citrin to disgorge and forfeit all compensation or other interests, profits and benefits received from any transaction made in violation of the covenant not to compete contained in the Grant during the period set forth therein;

E. That a judgment be entered in favor of Plaintiffs, and against Citrin, for compensatory damages in an amount presently unknown to Plaintiffs, but in good faith and reasonably believed to be in excess of $100,000;

F. That a judgment be entered in favor of Plaintiffs, and against Citrin, for punitive damages in the amount of $1,000,000;

G. An order awarding Plaintiffs its costs and attorneys' fees; and

H. An order awarding Plaintiffs such other and further relief as is just and equitable.

## COUNT III
## Computer Fraud and Abuse Act

30. Plaintiffs, as and for paragraph 30 of Count III re-allege paragraphs 1 – 19 as though fully set forth herein.

31. At all times relevant to this Complaint, there was in existence a certain statute, to- wit: The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030 *et seq*. The CFAA provides, in relevant part, as follows:

> Whoever ... knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer...

18 U.S.C. § 1030 (a)(5)(A)(i).

> by conduct described in clause (i), (ii), or (ii) of subparagraph (A), caused...

18 U.S.C. §1030 (a)(5)(B).

> loss to 1 or more person during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

18 U.S.C. §1030 (a)(5)(B)(i).

> the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

18 U.S.C. §1030 (e)(1).

> the term "protected computer" means.. .a computer which is used in interstate or foreign commerce or communication....

18 U.S.C. §1030(e)(2)(B).

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and **injunctive relief or other equitable relief**. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)1B)(i) are limited to economic damages.

18 U.S.C. § 1030(g) (emphasis added).

      32.      Citrin's willful destruction of pertinent data on IAC's computer and snap server is a violation of the civil provisions of the CFAA, pursuant to which Plaintiffs are entitled to damages and injunctive relief or other equitable relief.

33.     Citrin, as alleged herein, knowingly caused the transmission of a program, information, code or command, and, as a result of such conduct, intentionally caused damage, without authorization, to a protected computer within the meaning of the CFAA.

34.     Citrin's unlawful conduct has caused damages in an amount presently unknown to Plaintiffs, but in good faith and reasonably believed to be in excess of $10,000;

35.     By his continuing conduct, Citrin has demonstrated his willingness to continue to engage in acts that violate the CFAA. The injury to Plaintiffs is immediate and irreparable.

36.     Plaintiffs have demonstrated that Citrin, unless restrained, would continue to engage in conduct that is alleged herein. There is a likelihood that Plaintiffs will prevail on the merits of this action.

37.     Should this Court grant injunctive relief to Plaintiffs, the burden on Citrin would be slight compared to the injury to Plaintiffs, if it were not granted.  No injury to Citrin would result from an order requiring him to comport his actions under the law.

38.     The granting of an injunction will not disserve the public interest. Indeed, injunctive relief would accomplish the objectives of the CFAA.

WHEREFORE, for all the foregoing reasons, Plaintiffs, International Airport Centers L.L.C. and IACEA LLC respectfully request that this Court grant the following relief:

A.     Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, pursuant to Section (g) of the CFAA, against Citrin, enjoining him from engaging in acts and practices in violation of the CFAA;

B.     Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, pursuant to Section (g) of the CFAA, against Citrin, enjoining him from destroying or disposing of any books, records or accounts or of any property, whether real, personal or mixed, owned by Plaintiffs or in which Plaintiffs have an interest;

C.     Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, pursuant to Section (g) of the CFAA, against Citrin, enjoining him from

withdrawing, transferring or disposing of any property, whether real, personal or mixed, owned by Plaintiffs or in which Plaintiffs have an interest;

   D.   Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, pursuant to Section (g) of the CFAA, against Citrin, directing that he turnover all Plaintiffs' property, whether real, personal or mixed, owned by Plaintiffs or in which Plaintiffs have an interest, including, but not limited to, confidential business information and any copies of the same to Plaintiffs, including the return and restoration of all computer data files that Citrin destroyed or removed from IAC's computer and snap server;

   E.   That a judgment be entered in favor of Plaintiffs, and against Citrin, for compensatory damages in an amount presently unknown to Plaintiffs, but in good faith and reasonably believed to be in excess of $10,000;

   F.   That a judgment be entered in favor of Plaintiffs, and against Citrin, for punitive damages in an amount sufficient to generally and specifically deter his misconduct in the future;

   G.   An order awarding Plaintiffs its costs and attorneys' fees; and

   H.   Such other and additional relief as this Court may deem appropriate.

## COUNT IV
## Computer Tampering

39.   Plaintiffs, as and for paragraph 39 of Count IV, re-allege paragraphs 1 – 19 and 43 – 48 as though fully set forth herein.

40.   At all times relevant to this Complaint, there was in existence a certain statute prohibiting the act of Computer Tampering, 720 ILCS 5/16D-3 *et. seq.*, which provides, in relevant part, as follows:

> (a) A person commits the offense of computer tampering when he knowingly and without the authorization of a computer's owner ... or in excess of the authority granted to him:
>
> (4) Inserts or attempts to insert a "program" into a computer or computer program knowing or having reason to believe that such "program" contains information or commands that will or may damage or destroy that computer, . . .or that will or may alter, delete or remove a computer program or data from that computer, ... or that will or may cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such "program"

15

>   (c) Whoever suffers loss by reason of a violation of subsection (a)(4) of this Section may, in a civil action against the violator, obtain appropriate relief. In a civil action under this Section, the Court may award to the prevailing party reasonable attorney's fees and other litigation expenses.

720 ILCS 5/16D-3.

41. Citrin's willful destruction of pertinent data on IAC's computer and snap server is a violation of both the criminal and civil provisions of the computer tampering act, pursuant to which the Plaintiffs are entitled appropriate relief, attorneys' fees and other litigation expenses.

42. Citrin, as alleged herein, knowingly and without authorization inserted a program into IAC's computer and snap server intending that such program would execute commands to alter, delete and remove data from such computer and snap server. As a result of such conduct, Citrin intentionally caused the data on Plaintiffs' computer and snap server to be destroyed and therefore caused Plaintiffs' significant loss.

WHEREFORE, for all the foregoing reasons, Plaintiffs, International Airport Centers L.L.C. and IACEA LLC, respectfully request that this Court grant the following relief:

A. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, against Citrin, enjoining him from engaging in acts and practices in violation of the computer tampering act;

B. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, against Citrin, enjoining him from destroying or disposing of any books, records or accounts or of any property, whether real, personal or mixed, owned by Plaintiffs or in which Plaintiffs have an interest;

C. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction, against Citrin, enjoining him from withdrawing transferring or disposing of any property, whether real, personal or mixed, owned by Plaintiffs or in which Plaintiffs have an interest;

D. Entry of a Preliminary Injunction and, upon final disposition, entry of a Permanent Injunction, against Citrin, directing that he turnover all of Plaintiffs' property, whether real, personal or mixed, owned by Plaintiffs or in which Plaintiffs have an interest,

including, but not limited to, confidential business information and any copies of the same to Plaintiffs, including the return and restoration of all computer data files that Citrin destroyed or removed from IAC's computer and snap server;

E. That a judgment be entered in favor of Plaintiffs, and against Citrin, for compensatory damages in an amount presently unknown to Plaintiffs, but in good faith and reasonably believed to be in excess of $l00,000;

F. That a judgment be entered in favor of Plaintiffs, and against Citrin, for punitive damages in an amount sufficient to generally and specifically deter his misconduct in the future;

G. An order awarding Plaintiffs its costs and attorneys' fees pursuant to 720 ILCS 5/16D-3 (c); and

H. Such other and additional relief as this Court may deem appropriate

## COUNT V
### Illinois Trade Secrets Act

43. Plaintiffs, as and for paragraph 43 of Count V re-allege paragraphs 1 – 19 as though fully set forth herein.

44. At all times relevant to this Complaint, there was in existence a certain statute, to wit: the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*.

45. Plaintiffs' trade secrets, including those identified herein, are not generally known in the air freight distribution center industry and are therefore sufficiently secret to derive economic value, both actual and potential.

46. Plaintiffs' engaged in reasonable methods and practices to maintain the secrecy of their trade secrets as appropriate.

47. By engaging in the conduct alleged herein, Citrin has misappropriated, retained and misused Plaintiffs' trade secrets for his benefit and to the detriment of Plaintiffs, resulting Plaintiffs' loss of unique development opportunities. Further, it is inevitable that Citrin will continue to disclose and misappropriate Plaintiffs' trade secrets.

48.     Plaintiffs' obtained and developed such trade secrets over many years and at great expense.

49.     Citrin knowingly engaged, sponsored, aided and abetted the misappropriation of Plaintiffs' confidential business information for the benefit of himself and Cargo Ventures.

50.     Citrin's conduct is willful, malicious, and unauthorized and has caused and is causing irreparable harm, as well as substantial monetary damages to Plaintiffs.

51.     Citrin's misappropriation of Plaintiffs' trade secrets constitutes a violation of the ITSA.

52.     Section 3 of the ITSA allows this Court to enjoin any actual or inevitable misappropriation of Plaintiffs' trade secrets (765 ILCS 1065/3 (a)) and to compel Citrin to take affirmative acts to protect IAC's trade secrets from future misappropriation (765 ILCS 1065/3 (c)).

WHEREFORE, for all the foregoing reasons, Plaintiffs, International Airport Centers L.L.C. and IACEA LLC, respectfully request that the Court grant the following relief:

A.     An order finding and declaring that Citrin's conduct as alleged herein constitutes misappropriation of Plaintiffs' trade secrets in violation of the ITSA;

B.     Entry of a permanent injunction pursuant to 765 ILCS 1065/3 (a) enjoining Citrin, and any individual or entity acting in concert or participation with him, from engaging in acts and practices in further violation of the ITSA, including the continued use or benefit from Plaintiffs' trade secrets;

C.     An order pursuant to 765 ILCS 1065/3 (c) requiring Citrin, and any individual or entity acting in concert or participation with him, to return to Plaintiffs all trade secret information, including the return of and restoration of any and all trade secrets that Citrin may have destroyed or removed from IAC's computer;

D.     An order for an accounting requiring Citrin to account for any and all transactions made with the use and benefit of Plaintiffs' trade secrets, including all funds collected therefrom, whether as a result of those properties' development, lease, distribution, or otherwise;

  E. An order requiring Citrin to disgorge and forfeit all compensation or other interests, profits and benefits received from any and all transactions made with the use and benefit of Plaintiffs' trade secrets;

  F. That a judgment be entered in favor of Plaintiffs, and against Citrin, for compensatory damages pursuant to 765 ILCS 1065/4 (a) in an amount presently unknown to Plaintiffs, but in good faith and reasonably believed to be in excess of $100,000;

  G. That a judgment be entered in favor of Plaintiffs, and against Citrin, for exemplary damages in twice the amount awarded for actual loss pursuant to 765 ILCS 1065/4 (b);

  H. That a judgment be entered in favor of Plaintiffs, and against Citrin, for punitive damages in an amount sufficient to generally and specifically deter his misconduct in the future;

  I. An order awarding Plaintiffs its costs and attorneys' fees as provided for in Section 5 of the ITSA (765 ILCS 1065/5 (iii)); and

  J. An order awarding Plaintiffs such other and further relief as is just and equitable.

          **INTERNATIONAL AIRPORT CENTERS L.L.C.**
          **and IACEA, LLC**


          By:  /s/ Peter A. Silverman
             One of Their Attorneys


James R. Figliulo (6183947)
Peter A. Silverman (6196081)
Ben Capraro (6276413)
FIGLIULO & SILVERMAN, P.C.
10 South LaSalle Street, Suite 3600
Chicago, Illinois  60603
Telephone:  (312) 251-4600
Facsimile:  (312) 251-4610

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a copy of the foregoing:

**THIRD AMENDED COMPLAINT**

was caused to be served upon counsel listed below on September 20, 2006 via Electronic Notification through the U.S. District Court's ECF Filing System, or (where indicated below) by depositing a copy of same in the U.S. Mail at 10 S. LaSalle Street, Chicago, IL  60603 before 5:00 p.m., proper postage prepaid.

                                                      /s/ Peter A. Silverman___

## Electronic Email List

| | |
|---|---|
| Henry Marwood Baskerville, IV<br>Law Offices of Daniel Lynch<br>150 S. Wacker Drive<br>Suite 2600<br>Chicago, IL 60606<br>**hbaskerville@daniellynchlaw.com**<br>**jgilbert@daniellynchlaw.com** | Ronald L. Marmer<br>Jenner & Block LLP<br>One IBM Plaza<br>330 North Wabash<br>Chicago, IL 60611<br>**rmarmer@jenner.com**<br>**docketing@jenner.com** |
| David C. Bohan<br>Sachnoff & Weaver, Ltd.<br>10 South Wacker Drive<br>40th Floor<br>Chicago, IL 60606<br>**dbohan@sachnoff.com** | Bina Sanghavi<br>Sachnoff & Weaver, Ltd.<br>10 South Wacker Drive<br>40th Floor<br>Chicago, IL 60606<br>**bsanghavi@sachnoff.com** |
| Daniel Francis Lynch<br>Law Offices of Daniel Lynch<br>150 South Wacker Drive<br>#2600<br>Chicago, IL 60606<br>**dan@daniellynchlaw.com**<br>**SBHaffner@aol.com** | James L. Thompson<br>One IBM Plaza<br>330 North Wabash<br>Chicago, IL 60611<br>**jthompson@jenner.com**<br>**docketing@jenner.com** |

## Manual Notice List

| | |
|---|---|
| Jodi A. Kleinick<br>Paul, Hastings, Janofsky & Walker LLP<br>75 East 55th Street<br>New York, NY 10022 | Barry G. Sher<br>Paul, Hstings, Janofsky & Walker LLP<br>75 East 55th Street<br>New York, NY 10022 |